IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

UNITED STATES OF AMERICA,

  Plaintiff,

vs.

JANET MARTINEZ,

  Defendant.

Cv. No. 1:11-1063-JDB/egb
Cr. No. 1:07-10123-JDB-1

ORDER GRANTING MOTION FOR LEAVE TO FILE ADDITIONAL ARGUMENT,
(DOCKET ENTRY 9)
GRANTING MOTION TO AMEND TO ADD ADDITIONAL CLAIM,
(DOCKET ENTRY 10)
DENYING MOTION PURSUANT TO 28 U.S.C. § 2255,
DENYING CERTIFICATE OF APPEALABILITY,
CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH,
AND
DENYING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL

On March 11, 2011, Defendant, Janet Martinez, Bureau of
Prisons registration number 05682-298, an inmate at the Federal
Correctional Institution in Danbury, Connecticut, ("FCI") filed a
*pro se* motion under 28 U.S.C. § 2255. (Docket Entry ("D.E.") 1.)
On July 24, 2012, the Court directed the United States to respond
to the motion to vacate. (D.E. 3.) On October 4, 2012, the United
States filed a response and supporting affidavit and on October 29,
2012, Defendant filed a reply to the response. (D.E. 6-8.)

On October 29, 2012, and October 11, 2013, Martinez moved to
supplement and amend her motion to vacate. (D.E. 9, D.E. 10.) The
motions are GRANTED.

I. BACKGROUND

On November 19, 2007, a federal grand jury returned a nine-count indictment against Janet Martinez and eight codefendants. (Criminal ("Cr.") D.E. 3.) She was charged in Count One, with conspiracy to distribute over 500 grams of methamphetamine, in violation of 21 U.S.C. § 846; in Count Four, with aiding and abetting in the possession of methamphetamine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; in Count Seven, with aiding and abetting in the possession of methamphetamine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; and in Count Eight, with aiding and abetting in the possession of over fifty grams of methamphetamine with intent to distribute and distribution, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. (Id.) The factual basis underlying Defendant's vast criminal conspiracy to distribute methamphetamine is stated in the presentence report ("PSR"):

> 4.  On March 15, 2007, 27th Judicial Drug Task Force ("DTF") Investigators Shawn Palmer and David Crocker went to a home located at 502 South 6th Street, Union City, TN, the residence of a TN State parolee, Paul Bingham, Jr., a/k/a, "Porky" Bingham, and Mr. Bingham's girlfriend, Cammie Armour. Both Mr. Bingham and Ms. Armour were in the residence when case officers arrived and knocked on the front door, which was answered by Mr. Bingham. Cammie Armour was also present in the home at the time. Case investigators advised Mr. Bingham that, pursuant to a condition of his Kentucky parole (supervision by TN Board of Probation & Parole) which allows officers to conduct a search at any time for any reason, they intended to conduct a search of his residence. Mr. Bingham submitted to the residence search without incident. During a

search of the bedroom shared by Mr. Bingham and Cammie Armour, Investigator Palmer observed a large silver jewelry box on a night stand next to the bed. Upon opening the jewelry box, he found a sandwich bag containing several corner-tied bags of suspected crystal methamphetamine (a/k/a, "meth") and a set of digital scales. At that time, Mr. Bingham was placed under arrest for possession of methamphetamine for resale. Case officers conducted interviews with both Mr. Bingham and Ms. Armour, prior to transporting Mr. Bingham to the Obion County Sheriff's Office. Subsequent TBI Crime Laboratory analyses confirmed that the crystalline substance seized on March 15, 2007, contained methamphetamine. The total net weight of the substance (sans packaging) was 2.8 grams. Both Paul Bingham and Cammie Armour subsequently agreed to cooperate with case agents in the investigation of reported drug trafficking activities by Janet Martinez and other persons.

5.   On March 24, 2007, case agents conducted an interview of Heath Johnson. After being advised of his Miranda Rights, Mr. Johnson voluntarily provided information regarding his involvement in and knowledge of methamphetamine activities in and around Obion County, TN. In his statement, Mr. Johnson admitted to getting at least six (6) ounces of crystal methamphetamine from a male subject who lived in Union City with his cousin, co-defendant Rachel Morgan. Mr. Johnson stated that he always bought meth in ounce quantities for $1,400 to $1,700 an ounce. Mr. Johnson stated that his supplier bought methamphetamine from "the Mexicans who own the restaurant behind Wendy's in Union City." The restaurant identified by Mr. Johnson was known to case agents as El Cancun, which was and was known to be operated by members of Janet Martinez' family. Mr. Johnson reported virtually the same information in a subsequent statement given to agents on April 30, 2007.

6.   On April 16, 2007, Special Agent Jeff Jackson of the Tennessee Bureau of Investigation (TBI) interviewed Derek Patterson at the Obion County Jail. During that interview, Mr.

Patterson admitted extensive involvement in the sale of marijuana, as well as crystal methamphetamine, which he referred to as ice. Agent Jackson queried Defendant Patterson as to his dealings with crystal methamphetamine. Mr. Patterson advised that he began selling crystal meth on or about December 1, 2006, and that he had sold between two (2) to four (4) ounces of the drug per week since that time. Mr. Patterson advised that he had likely sold a total of between two (2) and four (4) pounds of meth since December 1, 2006. Mr. Patterson identified his source for the ice as PIO (or PO), a/k/a, Juan Ayon, whom he had met through Carrie Parrish.

7. On April 27, 2007, a cooperating source (CS), working with case agents, made a controlled purchase of what was represented to be one-half (1/2) ounce of ice/crystal methamphetamine from Henry Allen for $800. The purchase took place in the 900 block of High Street in Union City. Subsequent TBI Crime Laboratory analyses confirmed that the crystalline substance purchased from Henry Allen on April 27, 2007, contained methamphetamine with a total purity of 36%. The net weight of the substance was 13.8 grams.

8. On May 2, 2007, Cammie Armour, working at that time as a CS, introduced TBI Special Agent ("SA") Mandy Chestnut, working in an undercover capacity, to Rachel Morgan for the purpose of purchasing crystal methamphetamine. While arranging the deal with Rachel Morgan, Ms. Armour was told to call Janet Martinez at 731-446-2936, to make sure the drugs were being delivered. During that call, Janet Martinez advised Ms. Armour that someone would be dropping the drugs by Rachel Morgan's residence within 10 minutes. Within minutes, SA Jeff Jackson observed a white Chevrolet Avalanche, TN tag #926-PTV, pull up to Ms. Morgan's residence and drop something off at Ms. Morgan's residence, located at 206 East Cheatham Street in Union City. The white Avalanche was determined to be registered to Santiago Martinez-Amezquita. Soon after that delivery, SA Chestnut purchased what was represented to be one (1) ounce of crystal

meth for $1,700 from Ms. Morgan. Subsequent TBI Crime Laboratory analyses confirmed that the crystalline substance purchased from Rachel Morgan on May 2, 2007, contained methamphetamine with a total purity of 29%. The net weight of the substances was 27.2 grams.

9.  On May 10, 2007, Janet Martinez filed a police report, stating that her vehicle, a white Nissan Altima had been stolen. Ms. Martinez named Carrie Parrish as the primary suspect in the theft.

10. On May 11, 2007, case officers observed and photographed Henry Allen's Volvo automobile in front of Janet Martinez' residence on South 6th Street in Union City.

11. On May 14, 2007, SA Mandy Chestnut, working in an undercover capacity, made a second purchase of crystal methamphetamine from Rachel Morgan. Prior to that transaction, arrangements were made, via telephone, for the purchase of two (2) ounces of crystal meth. Per arrangement, SA Chestnut picked up Ms. Morgan at her home on East Cheatham Street in Union City. At Ms. Morgan's direction, SA Chestnut then drove to a park located on North Fifth Street, where the drug transaction took place. The negotiated price for each of two (2) bags of methamphetamine, reported to be one (1) ounce in each, was $1,600. During that meeting, Rachel Morgan talked about her source of methamphetamine, Janet Martinez, advising that Janet resides on 6th Street. She also discussed the number of children Ms. Martinez had. Subsequent TBI Crime Laboratory analyses confirmed that the crystalline substance purchased from Rachel Morgan on May 14, 2007, contained methamphetamine with a total purity of 12%. The net weight of the substance was 52.8 grams.

12. Also on May 14, 2007, a CS worked with case agents in making a controlled purchase of crystal methamphetamine from Derek Patterson. In conducting that operation, SA Ken Rhodes, working in an undercover capacity, and the CS, who had been provided $6,600 in confidential drug funds and equipped with an electronic

transmitter met Derek Patterson and another white male in the parking lot of a Dyersburg, TN convenience store.  Mr. Patterson and SA Rhodes left the parking lot in the CS' vehicle, while the CS entered Mr. Patterson's vehicle with the other subject.  Mr. Patterson and SA Rhodes drove to a residence in Dyersburg, Tennessee, where Mr. Patterson sold SA Rhodes approximately four (4) ounces of crystal methamphetamine for $6,400.  In addition, an agreement was reached for Mr. Patterson to sell SA Rhodes one-half (1/2) pound of meth the following week for $13,000.  Subsequent TBI Crime Laboratory analyses confirmed that the crystalline substance purchased from Mr. Patterson on May 14, 2007, contained methamphetamine with a total purity of 29%. The net weight of the substance was 111.6 grams.  It was subsequently determined that the methamphetamine purchased from Mr. Patterson on May 14, 2007, was part of a two (2) pound shipment of meth that had recently been stolen, along with a white Nissan Altima, from Janet Martinez by Carrie Parrish.

13.  On May 17, 2007, Henry Allen provided DTF SA Shawn Palmer and TBI SA Lee DeArmitt with a voluntary statement.  In his statement, Mr. Allen admitted that, from February, 2007 until late April, 2007, he was selling and/or using about one- fourth (1/4) ounce of crystal meth per week.  From late April until mid-May, 2007, he was selling and/or using about one-half (1/2) ounce of meth per week.  Mr. Allen advised that, during mid-April, 2007, he traveled with Carrie Parrish to a Denny's Restaurant on Camp Wisdom Road, outside of Dallas, TX.  At that location, an unidentified Hispanic male took the white Nissan Altima which Ms. Parrish was driving.  The Mexican male returned with that same vehicle a short time later.  Mr. Allen and Ms. Parrish then returned to Union City in the white Altima. Carrie Parrish received phone calls from Janet Martinez throughout the trip.  Mr. Allen was paid $500 and a quantity of meth for making the trip.

14.  Mr. Allen further reported that, on or about May 11, 2007, he made another trip to the same Dallas-area Denny's with a Mexican male known

to him as PO (a/k/a, Juan Ayon). They were met there by the same Hispanic male as during the mid-April trip. Mr. Ayon drove a green Mercedes-Benz, which was parked in the garage at a house on Lynn Street upon their return to Union City, TN. Mr. Ayon received calls from Janet Martinez throughout the trip. Upon returning to Union City, Mr. Allen was paid $500 for that trip.

15. On May 18, 2007, Janet Martinez' white Nissan Altima was recovered by law enforcement officers in West Memphis, Arkansas. Upon recovery, a drug canine "hit" on several areas of that vehicle.

16. On May 22, 2007, case surveillance officers observed a silver Toyota Corolla, CA license no. 5HMP979, at 2712 Lynn Street in Union City, the residence of Francisco and Yolanda Martinez.

17. On May 24, 2007, Santiago Martinez-Amezquita, was arrested in Lonoke County, Arkansas, after being found in possession of approximately two (2) pounds of crystal methamphetamine. The drugs were located in a concealed compartment in a silver Toyota Corolla, CA tag #5HPM979 (the same vehicle observed at 2712 Lynn Street on May 22nd). Mr. Martinez-Amezquita's phone showed several recent calls from Janet Martinez' phone (#731-446-2936). Mr. Martinez-Amezquita gave a statement that "Pio" gave him the car and $18,000 to go to CA and pick up drugs. Mr. Martinez-Amezquita was released from Arkansas custody after posting bond. Subsequent Arkansas State Crime Laboratory analyses confirmed that the crystalline substance seized from Mr. Martinez-Amezquita on May 24, 2007, contained methamphetamine. The net weight of the substance was 886.7 grams.

18. On May 25, 2007, Investigators Shawn Palmer and David Crocker interviewed Janet Martinez about the May 24, 2007, arrest of Santiago Martinez-Amezquita in Arkansas. During the interview, Janet Martinez told agents that she did not know where Santiago was prior to his arrest and that he was supposed to have been working in the Dyersburg area. Janet Martinez

asked the officers what was going to happen to the car (silver Toyota) that Martinez-Amezquita had been arrested in. Ms. Martinez advised agents that she had paid for the car in CA and had given it to Mr. Martinez-Amezquita to drive.

19. On June 12, 2007, SA Mandy Chestnut, again working undercover, made a third purchase of crystal methamphetamine from Rachel Morgan. During that pre-arranged transaction, which took place in the area of North 5th Street in Union City, SA Chestnut received four (4) separate baggies, each reportedly containing one (1) ounce of ice methamphetamine, from Ms. Morgan, in exchange for $6,000. Subsequent TBI Crime Laboratory analyses confirmed that the crystalline substance purchased from Rachel Morgan on June 12, 2007, contained methamphetamine with a total purity of 33%. The net weight of the substance was 105.6 grams.

20. On June 13, 2007, Santiago Martinez-Amezquita was arrested in Union City, TN, on a federal warrant issued out of the Eastern District of Arkansas. The federal warrant was issued as a result of his May 24, 2007, arrest in Lonoke County. Mr. Martinez-Amezquita was driving his white Chevrolet Avalanche at the time of his arrest. He later made a phone call, which was recorded, to Janet Martinez, stating that he had "left some sugar in her closet."

21. On July 11, 2007, Paul Bingham provided Investigator Shawn Palmer with a voluntary statement. In that statement, Mr. Bingham admitted that, on June 20, 2007, at the request of Janet Martinez, he made a trip to the Dallas, TX area for the purpose of picking up two (2) pounds of methamphetamine. Upon arrival at a Denny's restaurant, located on Camp Wisdom Road outside of Dallas, an unidentified Hispanic male placed the two (2) pounds of meth into his vehicle, inside a Gain detergent box. He was accompanied on that trip by Shane Glisson. Upon his return, Mr. Bingham delivered the detergent box with the meth to Janet Martinez' residence on South 6th Street in Union City. Janet Martinez paid Mr. Bingham $1,500 for making the trip.

22. On July 13, 2007, case agents met with a CS, who agreed to work with agents by introducing an undercover TBI agent to Janet Martinez, with the intent of purchasing methamphetamine from Ms. Martinez. The CS called Janet Martinez' cell phone (#731-446-2936) and made arrangements for the purchase of one (1) ounce of methamphetamine, for a purchase price of $1,200. During that call, Ms. Martinez instructed the CS to meet her in fifteen minutes at her mother's house. Upon meeting at 2712 Lynn Street, the residence of Francisco and Yolanda Martinez, the undercover agent was introduced to Janet Martinez by the CS. Janet Martinez then went to a bedroom, located next to the living room, and returned with a plastic bag containing methamphetamine, which she handed to the CS. The CS subsequently gave the bag to the undercover agent. Janet Martinez then placed a set of digital scales on a table and invited the undercover agent to weigh the meth. The undercover agent paid Janet Martinez $1,200 for the drugs. During that meeting, the undercover agent asked Janet Martinez about purchasing "two or three" (ounces) the next time. Ms. Martinez responded by telling the agent to call the CS, who would then call her. Yolanda Martinez was present throughout, but did not play an active part in the transaction. Subsequent TBI Crime Laboratory analyses confirmed that the crystalline substance purchased from Janet Martinez on July 13, 2007, contained methamphetamine with a total purity of 28%. The net weight of the substance was 26.9 grams.

23. On July 19, 2007, case officers conducted surveillance of the Francisco and Yolanda Martinez residence at 2712 Lynn Street, Union City, and observed Juan Ayon, a/k/a, PIO (PO), at that address.

24. On July 23, 2007, Investigator Todd Thayer of the Dyersburg (TN) Police Department interviewed Shawn Riley at the Dyer County Jail. Defendant Riley advised that he had known Carrie Parrish for approximately fourteen years, and that Ms. Parrish started dealing crystal meth (which he referred to as ice) in approximately November 2005. Mr.

Riley stated that, during November 2005, he moved in with Ms. Parrish and her boyfriend, Brian Martinez, the brother of Janet Martinez. Shawn Riley related that the day he moved in, he witnessed Carrie Parrish conduct three drug transactions involving ice, with the smallest quantity being an "eight ball" (3.5 grams). Mr. Riley reported that since November 2005, he had accompanied Carrie Parrish to Janet Martinez' residence on fifteen (15) to twenty (20) occasions, where he witnessed transactions of ice on each occasion. Mr. Riley stated that the largest transaction of ice he had witnessed between Ms. Parrish and Ms. Martinez occurred in February or March 2007, when they transacted three (3) ounces. Mr. Riley stated that Ms. Parrish typically gave Ms. Martinez $1,000 for one (1) ounce of ice. However, there were a few occasions when he witnessed two (2) ounce transactions between them.

25. Shawn Riley reported that Carrie Parrish and Derek Patterson met in approximately January 2007, after Carrie Parrish began supplying Mr. Patterson with ice. In approximately March 2007, Ms. Parrish, Mr. Patterson and a male known as Frenchy, at the direction of Janet Martinez, made a drug run to California in Ms. Martinez' white 2007 Nissan Altima. Mr. Riley reported that Ms. Martinez sent Derek Patterson and Frenchy home on a bus and sent a Hispanic male, later identified as co-defendant Santiago Martinez-Amezquita, with Carrie Parrish. On the return trip from California to Tennessee, Ms. Parrish and Mr. Martinez-Amezquita stopped for gas. While Mr. Martinez-Amezquita was paying for the gas, Ms. Parrish fled in the Nissan Altima, taking at least two (2) pounds of ice with her. Soon afterwards, Ms. Parrish met Derek Patterson, Shawn Riley, and three (3) unindicted co-conspirators in West Memphis, Arkansas, where the two (2) pounds of ice was placed in Mr. Patterson's black Cadillac. All of the subjects then drove to Dyersburg, Tennessee, where they stayed in separate hotels. Mr. Riley stated that they kept three (3) ounces of the ice for personal use and sold the remaining amount in various drug transactions.

26. On August 24, 2007, case agents met with the same CS that was involved in the July 13, 2007, buy from Janet Martinez. The purpose of the meeting was to arrange a purchase of two (2) ounces of meth from Janet Martinez by the undercover agent previously introduced to her by the CS. During a phone call, Janet Martinez instructed the CS to meet her at 2712 Lynn Street in fifteen minutes. Upon arriving at that address, the CS, accompanied by the undercover agent, encountered Ms. Martinez, as well as Adolfo Ortiz-Alcazar and Juan Ayon (PIO), both of whom were or had been boyfriends of Janet Martinez, in the driveway of the residence. After a brief conversation outside of the residence, Ms. Martinez, the CS, and the undercover agent went inside. After negotiating a price, the undercover agent gave Ms. Martinez $2,400 for two (2) ounces of methamphetamine. After placing the buy money into a drawer, Ms. Martinez stated that Adolfo (Ortiz-Alcazar) had already placed the "stuff" into their car while they were inside. When the CS and the undercover agent returned to their vehicle, they found two plastic corner-tied bags, each containing methamphetamine, wrapped in a paper towel. Subsequent TBI Crime Laboratory analyses confirmed that the crystalline substance purchased from Janet Martinez on August 24, 2007, contained methamphetamine with a total purity of 32%. The net weight of the substance was 53.7 grams.

27. On Thursday, September 20, 2007, DTF Investigator Shawn Palmer, accompanied by other Union City Police Department officers, went to the Union City residence of Jerry Still, for the purpose of confronting Mr. Still about recent felony thefts from a local Wal-Mart. After being advised of his Miranda Rights, Mr. Still voluntarily admitted that he had been stealing significant quantities of merchandise from several local stores. Mr. Still further advised that many of the stolen items were taken to Paul "Porky" Bingham, Jr. at 1608 West Highway 22, Union City, where Mr. Bingham and his girlfriend, Cammie Armour, were residing. He had then traded stolen merchandise to Paul Bingham, Jr., in exchange for quantities of crystal meth. Based on Mr.

Still's statements, case officers proceeded to the residence at 1608 West Highway 22, with the intention of recovering stolen merchandise, as described to them by Mr. Still. Upon arrival, case investigators observed numerous surveillance cameras around the perimeter of the home. Officers were allowed into the home by Cammie Armour and proceeded to conduct a search of the residence. Upon entering a bedroom, shared by Paul Bingham, Jr. and Ms. Armour, investigators observed, in plain view, a plastic baggie containing what appeared to a quantity of crystal meth. Another plastic baggie, also containing crystal meth, was recovered from a dresser drawer directly underneath. Further search of the bedroom resulted in the seizure of a used glass drug pipe and a box of unused drug pipes. A total of $400 cash was found on top of the dresser. Both Mr. Bingham and Ms. Armour were arrested on September 20, 2007, on TN State felony charges of Possession of Methamphetamine with Intent to Deliver and/or Sell. Subsequent TBI Crime Laboratory analyses confirmed that the substance seized on September 20, 2007, contained methamphetamine with a total purity of 12%. The net weight of the substance was 235.9 grams.

28. On September 21, 2007, Paul Bingham was interviewed by DTF Investigators Palmer and Crocker and by TBI SA Jeff Jackson. After signing a written waiver of his Miranda Rights, Mr. Bingham proceeded to give a voluntary statement. In that statement, Mr. Bingham admitted that, on the previous Sunday, he ordered five (5) ounces of meth from Janet Martinez for a purchase price of $1,000 per ounce. Per Janet's instructions, he actually received the five (5) ounces ordered from Adolfo (Ortiz-Alcazar) at Janet's trailer on Lynn Street. Mr. Bingham admitted having received an additional three (3) ounces of meth from Janet Martinez a week earlier. Mr. Bingham stated that he had been dealing ice since February, 2007. He estimated having received at least twenty (20) ounces of meth from Janet Martinez over the last thee (3) to four (4) months. He stated that Janet would usually front the meth to him. After selling

the meth, he would take the payment money to Janet's trailer on Lynn Street, where he would give it to either Adolfo Ortiz-Alcazar and/or "PO" (reference to co-defendant Juan L. Ayon, a/k/a, (PIO). He recalled once ordering five (5) ounces of meth from Janet and then going to the home of Janet's mother, Yolanda Martinez, to pick up the drugs. On that occasion, Yolanda Martinez handed Mr. Bingham a paper sack containing five (5) ounces of meth. He then gave Yolanda Martinez $5,000 in cash, which he said was Janet's payment for five (5) ounces of meth obtained a week earlier. Mr. Bingham admitted that, on at least two (2) occasions, he traveled to Texas, both times bringing back two (2) pounds of meth, which he delivered to Janet Martinez. He advised that Janet also obtains meth from California. Mr. Bingham stated that, on the California trips, Janet would carry the money with her, specifying that she would put up to $50,000 in her clothes and a suitcase. He said that Cammie (Armour) had helped Janet count the buy money before making one such trip.

29. On November 15, 2007, case agents went to 1608 West Highway 22, Union City, TN, for the purpose of interviewing Paul Bingham and Cammie Armour, who were residing at that address. Upon the agents' arrival, both Mr. Bingham and Ms. Armour indicated that they wished to speak with agents, despite the fact that both subjects had pending felony meth charges in Obion County. During the meeting, case agents noticed by their body language that both Mr. Bingham and Ms. Armour appeared to be very nervous. Case agents notified Mr. Bingham that, pursuant to a condition of his KY parole (supervision by TN Board of Probation & Parole) which allows officers to conduct a search at any time for any reason, they intended to conduct a search of the residence. During a search of Paul Bingham's bedroom, agents found approximately $4,000 in cash, which Mr. Bingham had placed into his wallet and then hidden in the bottom of a closet. Agents found a quantity of crystal meth in the bathroom of the residence. Also found and seized were two sets of digital scales, drug pipes, a hidden safe, and a

ledger of illegal drug transactions and sales. Both Mr. Bingham and Ms. Armour were arrested on drug charges and were advised of their Miranda Rights. Subsequent TBI Crime Laboratory analyses confirmed that the substance seized on November 15, 2007, contained methamphetamine with a total purity of 13%. The net weight of the substance was 12.5 grams.

30. On November 15, 2007, shortly after his arrest, Paul Bingham voluntarily admitted that, following his prior arrest (on September 21, 2007), his release on bond was made possible by the sale of meth. Mr. Bingham advised that, shortly after that arrest, Cammie Armour contacted their drug supplier (Janet Martinez) and obtained $10,000 worth of crystal meth, which she then sold in order to raise the money necessary to post his bond. Mr. Bingham advised that, since making bond, he had gone to his meth source at least five (5) times, obtaining two (2) to three (3) ounces of meth each time. He further advised that he was supposed to pick up another three (3) ounces of meth later that same day.

31. On November 19, 2007, a federal grand jury issued the instant federal indictment in this matter. On that same date, the federal grand jury issued a separate indictment (1:07CR10124), charging Shawn Riley, Carrie Parrish, and Derek Patterson with conspiracy and sale of methamphetamine.

32. On November 26, 2007, case agents executed a search warrant at 2712 Lynn Street, Union City, TN, the home of Francisco and Yolanda Martinez (husband and wife) and their adult son, Anthony Martinez. At approximately 9:00 a.m., agents knocked several times on the front door of the residence, which was answered by Anthony Martinez and Francisco Martinez. Agents then secured the residence occupants, Anthony Martinez, Francisco Martinez, Yolanda Martinez, an unidentified Mexican male, and Anthony Martinez' toddler son. Yolanda Martinez was found in the master bedroom area, where she was arrested on a warrant issued pursuant to the instant federal indictment. Agent Shawn Palmer took Anthony

Martinez into his bedroom. After being
advised that the room would be thoroughly
searched, Anthony Martinez stated that there
was a lot of money in a safe under the baby
crib. He also pointed to a stuffed snowman
located in the baby crib and advised that
drugs could be found in the snowman's hat.
Mr. Martinez' infant son was asleep in the
crib, with the toy snowman lying beside the
baby's head. Agent Palmer subsequently
recovered a substantial amount of crystal meth
from inside a hat which was on the toy
snowman. Anthony Martinez advised officers
that, before his brother-in-law, Juan Ayon,
was arrested, he had hidden some guns in
Anthony's room. DTF Sgt. Thayer subsequently
recovered two (2) handguns from inside the
bedroom closet. Agent Palmer recovered a safe
from underneath the baby crib. He then opened
the safe using a key supplied by Anthony
Martinez. A total of $54,250 was found inside
the safe. Another $200 was found under the
crib mattress, while another $968 was
discovered in a plastic bag in the bedroom
closet. Anthony Martinez was carrying an
additional $653 in his wallet. Anthony
Martinez was arrested and charged with
Possession of a Schedule II Controlled
Substance with Intent to Distribute.

33.   During a search of the rest of the home,
      agents recovered a third handgun, identified
      as a loaded Hi-Point, .40 caliber, Smith &
      Wesson, from a night stand in the master
      bedroom, used by Francisco and Yolanda
      Martinez. A total of $1,000 cash, wrapped in
      a rubber band, was recovered from the top
      drawer of a tall dresser in the master
      bedroom. Another $2,450 was found in
      Francisco Martinez' wallet. Subsequent TBI
      Crime Laboratory analyses confirmed that the
      substance seized from 2712 Lynn Street on
      November 26, 2007, contained methamphetamine
      with a total purity of 32%. The net weight of
      the substance was 81.1 grams.

34.   Also on November 26, 2007, case agents
      executed a search warrant at 2807 Lynn Street,
      Union City, TN, the home of Janet Martinez.
      No person was present at that residence at the
      time of the search, conducted simultaneous to

the search of the 2712 Lynn Street residence.
Upon searching the residence, agents recovered
a locked box from underneath Janet Martinez'
bed. Approximately one (1) ounce of crystal
meth and approximately $28,000 cash was found
inside the box. Other items found and seized
from the residence included: digital scales,
illegal narcotic packaging materials, a
crystal substance (used as a cutting agent), a
food sealing machine, and food sealer bags
(both used and unused). Meth residue was
found inside the used food sealer bags.
Subsequent TBI Crime Laboratory analyses
confirmed that the suspect substance seized
from 2807 Lynn Street on November 26, 2007,
contained methamphetamine with a total purity
of 14%. The net weight of the substance was
16.1 grams.

35. On November 26, 2007, case agents interviewed
Derek Patterson at the Obion County Jail.
After being advised of his Miranda Rights, Mr.
Patterson voluntarily provided agents with a
written statement. In that statement, Mr.
Patterson related that he first began buying
crystal meth from Janet Martinez and "PO"
(PIO), a/k/a, Juan Ayon, during January, 2007.
He reported having purchased three (3) ounces
of meth per week from Janet Martinez and/or
Juan Ayon during the period from January
through April of 2007. During that same
period, Mr. Patterson and Carrie Parrish made
three (3) trips to CA for Janet Martinez. He
denied knowing how much meth was transported
during those trips to CA. Upon their return
to Union City, Juan Ayon would take the car,
still containing the meth, to another
location. Janet Martinez would pay him for
making the trip with cash and meth, usually at
least $1,000 and one (1) ounce of meth. Mr.
Patterson also gave information regarding the
May, 2007, theft of a white Nissan Altima and
approximately two (2) pounds of
methamphetamine from Janet Martinez by Carrie
Parrish. Information given by Mr. Patterson
regarding that matter was fully corroborative
of the July 23, 2007, statement given by Shawn
Riley in regard to that same matter. He
stated that, after the drug theft, Janet
Martinez threatened to kill both him and
Carrie Parrish. He reported that Janet also

made threats to harm and/or kill Carrie to Ms. Parrish's parents, brother, and various friends. He further stated that Janet and other Hispanic males had chased Carrie Parrish with guns. Mr. Patterson reported having later "smoothed things out" with Janet Martinez, after which he bought a total of approximately eight (8) more ounces of meth from Janet and/or Juan Ayon.

36. On November 26, 2007, case agents executed a search warrant at 645 Jackson Road in Weakley County, TN, the residence of Adolfo Ortiz-Alcazar. During the search, agents found two (2) plastic bags, inside of which were several smaller plastic bags, each containing what was determined to be crystal meth. The meth was found inside the heating/cooling vent in the master bedroom of the mobile home. Two (2) plastic bags, both containing large (not further specified) amounts of U.S. currency were found in a plastic bag located under the dresser in the master bedroom and in a back bedroom floor grate. An additional $934 cash was found in a pair of blue jeans in the master bedroom. Several Sigue LLC receipts, evidencing wire transfers of significant amounts of money, were found and seized. Containers of MSM and whey protein (both commonly used as cutting agents for illegal drugs) and numerous drug packaging materials were seized. Subsequent TBI Crime Laboratory analyses confirmed that the suspect substance seized from Mr. Ortiz-Alcazar's residence on November 26, 2007, contained methamphetamine with a total purity of 10%. The net weight of the substance was 573.4 grams.

37. On November 27, 2007, case agents conducted an interview of Shawn Riley at the Dyer County Jail, where Mr. Riley was being held on unrelated state charges. During that meeting, Mr. Riley, after being advised of his Miranda Rights, stood by an earlier statement given to case agents on July 23, 2007. Mr. Riley further stated that, since the May, 2007, theft of drugs (by Carrie Parrish) from Janet Martinez, he had obtained methamphetamine from Janet Martinez on two (2) occasions.

38. Also on November 26, 2007, DTP Agent Palmer and TBI SA Mandy Chestnut attempted to interview Rachel Morgan, who was being held on a federal warrant at the Obion County Jail. After being advised of her Miranda Rights, Ms. Morgan admitted having sold methamphetamine to SA Chestnut and said that the drugs had come from Janet Martinez. She denied having dealt with Janet Martinez over the last few months.

39. On December 19, 2007, Marcelo Vera, who was indicted and convicted in regard to a separate TN/WD felony methamphetamine case (#1:08CR10023-001), gave a proffer statement to DTF Agent Shawn Palmer. In his statement, Mr. Vera advised that, earlier on that same date, he was called by the mother of Janet Martinez, Yolanda Martinez. He said that Yolanda Martinez asked him to wire money to Janet Martinez, who had gone to Mexico in an attempt to flee a federal drug conspiracy indictment. Mr. Vera went to the home of Yolanda Martinez, where he was given $2,000 in cash. He then wired that money, as instructed, to Janet Martinez in Mexico. Mr. Vera further advised that he had been buying meth from Adolfo Ortiz-Alcazar, whom he identified as Janet Martinez' boyfriend, since September, 2007, when he first bought one (1) ounce of meth from Mr. Ortiz-Alcazar for $1,000. After that first buy, he bought four (4) to five (5) ounces of meth every other week until October. Mr. Vera advised that, during October and November, 2007, he bought a total of four (4) to five (5) pounds of methamphetamine from Mr. Ortiz-Alcazar, at a purchase price of $13,000 per pound. Mr. Ortiz-Alcazar would front all of the meth to Mr. Vera, who would then sell the drugs before paying Mr. Ortiz-Alcazar.

40. On February 22, 2008, SA Lee DeArmitt interviewed Carrie Parrish at the Obion County Jail, where she was being held on felony meth conspiracy charges in regard to TN/WD #1:07CR10124-003. Ms. Parrish reported that, during late 2006, she began dating Brian Martinez, who was being supplied with ice by his sister, Janet Martinez. Ms. Parrish related that Brian Martinez gave her quantities of ice for personal use and

additional quantities for her to sell. Carrie Parrish stated that she soon began obtaining ice from Janet Martinez and/or her boyfriend, Adolfo (Ortiz-Alcazar). Ms. Parrish related that, during late 2006, she accompanied Janet Martinez, another individual known as "Carmella," and Ms. Martinez' daughter to Turlock, California, where they met up with Juan Ayon. Ms. Martinez advised Ms. Parrish that there were drugs and/or money in the car they traveled in, and directed her to drive the vehicle containing the drugs and/or money back to Tennessee. Ms. Martinez told Parrish that she and Carmella would be paid $1,000 each for making the trip. Ms. Parrish related that in the early part of 2007, she moved in with Janet Martinez. During that period, Janet Martinez went to Mexico for nine or ten weeks, leaving Ms. Parrish in charge of her (Martinez') children and the drug business. Ms. Parrish also gave details about her May, 2007, theft of a white Nissan Altima and approximately two (2) pounds of meth from Janet Martinez. Information given by Ms. Parrish regarding that matter was corroborative of information previously given by both Shawn Riley and Derek Patterson in regard to that same matter. Ms. Parrish recalled that on one occasion after stealing the drugs from Janet, Ms. Martinez pulled beside her vehicle, yelling at her to pull over. After Ms. Parrish, who had her children in the vehicle with her, refused to pull over, Ms. Martinez swerved at her, in an attempt to run her off of the road. Janet Martinez chased Ms. Parrish to Dyersburg, where she was cut off at a red light by Derek Patterson.

41. On April 8, 2008, Santiago Martinez-Amezquita, who was accompanied by defense counsel, submitted to an interview by case investigators. The interview, conducted pursuant to a proffer agreement, took place at the Dallas County Detention Center in Fordyce, Arkansas. During that interview, Mr. Martinez-Amezquita stated that he first met Janet Martinez during early May, 2007, at which time he agreed to assist Ms. Martinez in her drug trafficking business. The day after meeting Janet Martinez, she directed him to a red brick home near the Union City Park, which

he learned was being used as a stash house. Janet Martinez, Adolfo Ortiz-Alcazar, and Juan Ayon were all present in the stash house during his first visit there. Soon after arriving, Janet retrieved a plastic bag containing from one-half (12) to one (1) pound of a substance, which she referred to as both "ice" and "yellow", from a closet in the back bedroom. Ms. Martinez advised him that this was the product that her organization sold. She advised Mr. Martinez-Amezquita that he would be paid $100 for each half-ounce and $500 for each ounce of "yellow" that he sold. At Janet's direction, Juan Ayon showed Mr. Martinez-Amezquita how to break down, weigh, and package the "yellow" into half-ounce and ounce quantities, which Janet stated were the only quantities sold by her organization. She specified that half-ounces sold for $500 and full ounces for $1,000. Janet subsequently provided him with a key to the stash house and stated that she would be introducing him to her regular customers. Over the next few days, Janet Martinez directed Mr. Martinez-Amezquita several times to retrieve half-ounce and ounce quantities of meth from the stash house and to deliver those drugs to her at a specified location. Mr. Martinez-Amezquita advised that Yolanda Martinez was privy to Janet's drug trafficking activities. He further advised that Janet Martinez stored the proceeds of her drug activities in a safe underneath a bed in Yolanda Martinez' residence.

42. Mr. Martinez-Amezquita gave detailed information regarding two (2) separate trips to California with Janet Martinez. He related that Ms. Martinez obtained two (2) pounds of methamphetamine during each of those trips. During the second trip, acting on the instructions of Janet Martinez, he drove a silver Toyota Corolla, containing two (2) pounds of meth, from California back to Yolanda Martinez' residence in Union City. On both occasions, Janet Martinez and Juan Ayon were at that residence upon his arrival.

43. The day after Mr. Martinez-Amezquita arrived back from his second trip to California, Janet Martinez contacted him and advised that she

needed him to make a drug run to Texas, for which he would be paid $5,000. He subsequently traveled in the aforementioned silver Toyota Corolla to a Denny's Restaurant, located on Camp Wisdom Road outside of Dallas, Texas, where approximately two (2) pounds of crystal meth were placed into his car by an unidentified Hispanic male. On the return trip from Texas, he was stopped by Arkansas State Police for "following too close." He was arrested on felony meth charges after 886.7 grams (net weight) of meth were discovered in the vehicle that he was driving.

44. On May 2, 2008, Anthony Martinez, who was accompanied by defense counsel, provided a proffer statement to case agents. In his statement, Mr. Martinez admitted significant knowledge of the coordinated drug trafficking activities of Janet Martinez, Adolfo Ortiz-Alcazar, and Juan Ayon, as well as that of unindicted co-conspirators. He further admitted that Adolfo Ortiz-Alcazar had recruited him (Anthony) to assist in the drug business, offering him $100 for each bag of methamphetamine that he sold to "Porky" Bingham and/or other customers.

45. On July 30, 2008, Carrie Parrish, accompanied by defense counsel, met with DTF Investigator Shawn Palmer and Dyersburg Police Department Investigator Todd Thayer for the purpose of making a proffer statement. Ms. Parrish provided information elaborating on her earlier written statements to case agents. Ms. Parrish advised that, in April 2007, at the request of Janet Martinez, she drove Yolanda Martinez to Princeton, Kentucky in order to pick up drugs from Juan Ayon. During 2007, whenever Janet Martinez traveled to Mexico, Carrie Parrish obtained drugs from Francisco Martinez at his restaurant, El Cancun, in Union City, Tennessee. Ms. Parrish reported having picked up two (2) to three (3) ounces of ice per day on approximately 20 to 24 occasions. Ms. Parrish also obtained ice from Janet Martinez' brother, Anthony Martinez, on several occasions. She stated that the largest single amount that she obtained from Anthony Martinez was 1/8th ounce and the smallest amount was one (1) gram. Ms.

Parrish stated that Anthony Martinez had bragged to her about making several trips to Mexico to pick up drugs, for which he was paid $5,000 per trip. Anthony Martinez told her that he would typically bring back a couple (2) pounds of ice in washing powder boxes. During November, 2006, Ms. Parrish began dating Brian Martinez, who at that time was selling ice. She reportedly witnessed Brian Martinez selling as much as two (2) ounces of meth in a single transaction. Ms. Parrish personally bought quantities of ice between one-half (1/2) ounce and one (1) ounce from Brian Martinez. During periods when Janet Martinez was in Mexico, Carrie Parrish drove Brian Martinez to the home of Francisco Martinez to cut the ice. She specified that, in the cutting process, they would use one-half pound of cutting agent per one-half pound of ice. Ms. Parrish recalled two occasions when she drove Brian Martinez to the apartment of Anthony Martinez and Juan Ayon in Princeton, Kentucky to purchase one (1) ounce of ice. Ms. Parrish recalled another occasion when she drove Juan Ayon to Nashville, so that he could fly to California. Prior to his departure, Mr. Ayon left one (1) pound of phosphorous-type methamphetamine with another Hispanic male in Union City.

46. On August 6, 2008, case agents met with Adolfo Ortiz-Alcazar, who was accompanied by defense counsel, at the U.S. Marshals Office in Jackson, TN, for the purpose of receiving a proffer statement from Mr. Ortiz-Alcazar. In his statement, Mr. Ortiz-Alcazar stated that he first came to Union City, TN approximately 5 or 6 years ago. He eventually became involved with Janet Martinez, after which Ms. Martinez, sometimes accompanied by one or more Hispanic males, would bring drugs over to his (Ortiz-Alcazar's) trailer home for storage. He said that Janet Martinez would typically bring two (2) pounds of ice methamphetamine to his home every two (2) weeks. On occasions, Mr. Ortiz-Alcazar, on Janet Martinez' instructions, would deliver methamphetamine to Janet's house. He recalled having once delivered one (1) ounce of meth to Yolanda Martinez, again at Janet's instruction. Mr. Ortiz-Alcazar said that Anthony Martinez

picked up two (2) ounces from his residence on two (2) different occasions and ten (10) ounces on a third occasion. Mr. Ortiz-Alcazar reported having once delivered $80,000 to Juan Ayon at Yolanda and Francisco Martinez' home on Lynn Street. Upon receiving the money, Mr. Ayon put the $80,000 in a laundry detergent box. The money was taken to California and used by Janet Martinez to purchase crystal meth, which she then stored at Ortiz-Alcazar's residence. Mr. Ortiz-Alcazar claimed knowledge that Janet Martinez and Juan Ayon had traveled together to California on two (2) occasions and had brought back at least four (4) pounds of meth. While admitting his involvement with Janet Martinez and Juan Ayon, he denied having personally sold drugs to any person.

47. The following chart lists actual methamphetamine purchases and/or seizures made directly pursuant to the investigation of the Count one methamphetamine conspiracy. Included in the following chart are the dates of actual drug buys and/or seizures, the name(s) of the person(s) from whom the drug buy was made and/or the location of the drug seizure, and the net weight of the methamphetamine purchased/seized. Because of Janet Martinez' role as an organizer and/or manager of the drug conspiracy, all of the below-listed drug quantities would be attributable to Ms. Martinez.

| DATE | TYPE/NAMES(S) | NET AMOUNT |
|------|---------------|-----------:|
| 04/27/07 | Drug Buy/Henry Allen | 13.8 grams |
| 05/02/07 | Drug Buy/Janet Martinez; Rachel Morgan Santiago Martinez-Amezquita | 27.2 grams |
| 05/14/07 | Drug Buy/Rachel Morgan | 52.8 grams |
| 05/14/07 | Drug Buy/Derek Patterson | 111.6 grams |
| 05/24/07 | Seizure/Lonoke County, AR | 886.7 grams |
| 06/12/07 | Drug Buy/Rachel Morgan | 105.6 grams |
| 07/13/07 | Drug Buy/Janet Martinez; Yolanda Martinez | 26.9 grams |
| 08/24/07 | Drug Buy/Janet Martinez; Adolfo Ortiz- Alcazar; Juan Ayon | 53.7 grams |
| 09/20/07 | Seizure/Paul Bingham & Cammie Armour residence | 235.9 grams |
| 11/15/07 | Seizure/Paul Bingham & Cammie Armour residence | 12.5 grams |

| | | |
|---|---|---|
| 11/26/07 | Seizure/2712 Lynn Street (Yolanda, Francisco,& Anthony Martinez' residence) | 81.1 grams |
| 11/26/07 | Seizure/2807 Lynn Street (Janet Martinez' residence) | 16.1 grams |
| 11/26/07 | Seizure I (Adolfo Ortiz-Alcazar's residence) | 573.4 grams |

| | |
|---|---|
| TOTAL OF LISTED PURCHASES/SEIZURES = | 2,197.3 grams |

(PSR ¶¶ 4-47.)

On March 6, 2009, Martinez pled guilty to Count One of the indictment, pursuant to a written plea agreement. (Cr. D.E. 247.)

The plea agreement provided as follows:

> Come now the parties herein, the defendant, Janet Martinez, being represented by counsel, Steve West, and the United States being represented by Jerry R. Kitchen, Assistant United States Attorney for the Western District of Tennessee and hereby agree as follows:
>
> 1. The following plea agreement constitutes the entire agreement between the parties and the parties agree that any issues not specifically addressed by this plea agreement shall be resolved by the Court in accordance with the applicable statues, guidelines, rules and case law.
>
> 2. The defendant agrees to plead guilty to Count 1 of the Indictment in the above-styled cause. The defendant will pay the $100.00 special assessment prior to sentencing.
>
> 3. There is no agreement as to the appropriate criminal history of the defendant.
>
> 4. Should it be judged by the Government that the defendant has committed or attempted to commit any additional crimes or has engaged in any conduct constituting, obstructing or impeding justice within the meaning of United States Sentencing Guidelines Section 3C1.1 or has failed to make any court appearances in this case, from the date of the defendant's signing of this plea agreement to the date of the defendant's sentencing, or if the defendant

attempts to withdraw his/her plea, the Government will be released from its obligations and would become free to argue for any sentence within statutory limits. Such a breach by the defendant would not release the defendant from this plea of guilty.

5.  The parties agree that the Government will recommend the following: (1) that the Defendant receive a three-level reduction for acceptance of responsibility under U.S. Sentencing Guidelines § 3E1.1; and (2) that the Defendant be sentenced at the lowest end of the applicable guideline range.

6.  The Defendant is aware that Title 18 United States Code, section 3742 affords him/her the right to appeal the sentence imposed in this case. Acknowledging this, in exchange for the undertakings made by the United States in this plea agreement, the defendant hereby waives all rights conferred by Section 3742 to appeal any sentence imposed, including any restitution order, or to appeal the manner in which the sentence was imposed, unless the sentence exceeds the maximum permitted by statute or is the result of an upward departure from the guideline range that the court establishes at sentencing. The defendant further understands that nothing in this agreement shall affect the government's right and/or duty to appeal as set forth in Title 18, United States Code, Section 3742(b). However, if the United States appeals the defendant's sentence pursuant to Section 3742(b), the defendant shall be released from the above waiver of appellate rights. By signing this agreement, the defendant acknowledges that he/she has discussed the appeal waiver set forth in this agreement with his/her attorney. The defendant further agrees, together with the United States, to request that the district court enter a specific finding that the defendant's waiver of his/her right to appeal the sentence to be imposed in this case was knowing and voluntary.

7.  The defendant understands and agrees that the Court will make the final determination of facts as to any sentence and as to any

mitigating or aggravating factors concerning the sentence to be imposed. Adverse rulings by the Court shall not be grounds for the withdrawal of the Defendant's guilty plea or to appeal any sentence imposed. The Court is not limited to consideration of the facts and events provided by the Government.

8. There are not other agreements between and among the parties to this agreement. The defendant enters this agreement freely, knowingly, and voluntarily, and upon the advice of counsel.

(Cr. D.E. 248 at 1-3.)

On February 22, 2010, the Court determined Martinez' advisory guidelines range as 210 to 262 months and sentenced her to 180 months of imprisonment, to be followed by a five-year term of supervised release. (Cr. D.E. 454.) The Court's judgment was entered on February 23, 2010. (D.E. 456.) Martinez did not appeal.

On March 11, 2011, Defendant filed this § 2255 motion alleging that:

1. counsel provided ineffective assistance by:

   A. failing to challenge the Government's failure to file a motion pursuant to U.S.S.G. § 5K1.1 during the sentencing hearing (D.E. 1 at 6);

   B. failing to raise the Government's failure to file a motion pursuant to U.S.S.G. § 5K1.1 on appeal (Id.);

   C. failing to challenge the drug amounts attributable to Defendant during the sentencing hearing (Id.);

   D. failing to object to the enhancement of Defendant's sentence for her leadership role in the offense (D.E. 9 at 1-2)(D.E. 8 at 1-2);

2. the Government violated due process by failing to file a motion for a downward departure based on Defendant's substantial cooperation (D.E. 1 at 6); and

3. she is entitled to relief in light of the Supreme Court's
decision in <u>Alleyene v. United States</u>, ___ U.S. ___, 133
S. Ct. 2151, 186 L. Ed. 2d 314 (2013)(D.E. 10 at 1-8).

## II.  THE LEGAL STANDARDS

Pursuant to 28 U.S.C. § 2255(a),

> [a] prisoner in custody under sentence of a court
> established by Act of Congress claiming the right to be
> released upon the ground that the sentence was imposed in
> violation of the Constitution or laws of the United
> States, or that the court was without jurisdiction to
> impose such sentence, or that the sentence was in excess
> of the maximum authorized by law, or is otherwise subject
> to collateral attack, may move the court which imposed
> the sentence to vacate, set aside or correct the
> sentence.

"A prisoner seeking relief under 28 U.S.C. § 2255 must allege
either (1) an error of constitutional magnitude; (2) a sentence
imposed outside the statutory limits; or (3) an error of fact or
law that was so fundamental as to render the entire proceeding
invalid." <u>Short v. United States</u>, 471 F.3d 686, 691 (6th Cir. 2006)
(internal quotation marks omitted).

A § 2255 motion is not a substitute for a direct appeal.
*See* <u>Ray v. United States</u>, 721 F.3d 758, 761 (6th Cir. 2013).
"[N]onconstitutional claims that could have been raised on appeal,
but were not, may not be asserted in collateral proceedings."
<u>Stone v. Powell</u>, 428 U.S. 465, 477 n.10, 96 S. Ct. 3037, 3044 n.10,
49 L. Ed. 2d 1067 (1976).  "Defendants must assert their claims in
the ordinary course of trial and direct appeal." <u>Grant v. United
States</u>, 72 F.3d 503, 506 (6th Cir. 1996), *cert. denied*, 517 U.S.
1200, 116 S. Ct. 1701, 134 L. Ed. 2d 800 (1996).  This rule is not
absolute:

> If claims have been forfeited by virtue of ineffective assistance of counsel, then relief under § 2255 would be available subject to the standard of <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). In those rare instances where the defaulted claim is of an error not ordinarily cognizable or constitutional error, but the error is committed in a context that is so positively outrageous as to indicate a "complete miscarriage of justice," it seems to us that what is really being asserted is a violation of due process.

<u>Id.</u>

Even constitutional claims that could have been raised on direct appeal, but were not, will be barred by procedural default unless the defendant demonstrates cause and prejudice sufficient to excuse her failure to raise these issues previously. <u>See</u> <u>El-Nobani v. United States</u>, 287 F.3d 417, 420 (6th Cir. 2002) (withdrawal of guilty plea); <u>Peveler v. United States</u>, 269 F.3d 693, 698-99 (6th Cir. 2001) (new Supreme Court decision issued during pendency of direct appeal); <u>Phillip v. United States</u>, 229 F.3d 550, 552 (6th Cir. 2000) (trial errors). Alternatively, a defendant may obtain review of a procedurally defaulted claim by demonstrating her "actual innocence." <u>Bousley v. United States</u>, 523 U.S. 614, 622, 118 S. Ct. 1604, 1611, 140 L. Ed. 2d 828 (1998).

After a § 2255 motion is filed, it is reviewed by the court and, "[i]f it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion." Rule 4(b), Rules Governing Section 2255 Proceedings for the United States District Courts ("Section 2255 Rules"). "If the motion is not dismissed, the judge must order the United States attorney to

file an answer, motion, or other response within a fixed time, or to take other action the judge may order." Id. The movant is entitled to reply to the Government's response. Rule 5(d), Section 2255 Rules. The Court may also direct the parties to provide additional information relating to the motion. Rule 7, Section 2255 Rules.

"In reviewing a § 2255 motion in which a factual dispute arises, 'the habeas court must hold an evidentiary hearing to determine the truth of the petitioner's claims.'" Valentine v. United States, 488 F.3d 325, 333 (6th Cir. 2007), *cert. denied*, 552 U.S. 1217, 128 S. Ct. 1311, 170 L. Ed. 2d 127 (2008), *reh'g denied*, 552 U.S. 1305, 128 S. Ct. 1763, 170 L. Ed. 2d 557 (Mar. 31, 2008) (quoting Turner v. United States, 183 F.3d 474, 477 (6th Cir. 1999)). "'[N]o hearing is required if the petitioner's allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact.'" Id. (quoting Arredondo v. United States, 178 F.3d 778, 782 (6th Cir. 1999)). Where the judge considering the § 2255 motion also presided over the criminal case, the judge may rely on his or her recollection of the prior case. Blanton v. United States, 94 F.3d 227, 235 (6th Cir. 1996); *reh'g & suggestion for reh'g en banc denied* (Oct. 1, 1996); *see also* Blackledge v. Allison, 431 U.S. 63, 74 n.4, 97 S. Ct. 1621, 1629, 52 L. Ed. 2d 136 (1977) ("[A] motion under § 2255 is ordinarily presented to the judge who presided at the original conviction and sentencing of the prisoner. In some cases, the judge's recollection of the events at

issue may enable him summarily to dismiss a § 2255 motion."). Defendant has the burden of proving that she is entitled to relief by a preponderance of the evidence. Pough v. United States, 442 F.3d 959, 964 (6th Cir. 2006), *reh'g denied* (May 3, 2006).

III. ANALYSIS OF MOVANT'S CLAIMS

A. INEFFECTIVE ASSISTANCE OF COUNSEL

With the exception of Issue 3, Defendant attempts to demonstrate cause and prejudice for the procedural default of her claims by contending that counsel provided ineffective assistance. She cannot, however, demonstrate that she was prejudiced by her attorney's representation or that counsel's performance was deficient.

A claim that ineffective assistance of counsel has deprived a defendant of her Sixth Amendment right to counsel is controlled by the standards stated in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), *reh'g denied*, 467 U.S. 1267, 104 S. Ct. 3562, 82 L. Ed. 2d 864 (June 25, 1984). To demonstrate deficient performance by counsel, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness." Id. at 688, 104 S. Ct. at 2064. "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance. [Strickland, 466 U.S.] at 689, 104 S. Ct. 2052. The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth

Amendment.' Id., at 687, 104 S. Ct. 2052." Harrington v. Richter,
___ U.S. ___, ___, 131 S. Ct. 770, 787, 178 L. Ed. 2d 624 (2011).

To demonstrate prejudice, a prisoner must show "a reasonable
probability that, but for counsel's unprofessional errors, the
result of the proceeding would have been different." Id. at 694,
104 S. Ct. at 2068.[1] "A reasonable probability is a probability
sufficient to undermine confidence in the outcome." Id. "It is
not enough 'to show that the errors had some conceivable effect on
the outcome of the proceeding.' [Strickland, 466 U.S.] at 693, 104
S. Ct. 2052. Counsel's errors must be 'so serious as to deprive
the defendant of a fair trial, a trial whose result is reliable.'
Id., at 687, 104 S. Ct. 2052." Richter, ___ U.S. at ___, 131 S.
Ct. at 787-88; see also id. at ___, 131 S. Ct. at 791-72 ("In
assessing prejudice under Strickland, the question is not whether
a court can be certain counsel's performance had no effect on the
outcome or whether it is possible a reasonable doubt might have
been established if counsel acted differently. . . . The likelihood
of a different result must be substantial, not just conceivable.")
(citations omitted); Wong v. Belmontes, 558 U.S. 15, 27, 130 S. Ct.
383, 391-92, 175 L. Ed. 2d 328 (2009) (per curiam) ("But Strickland
does not require the State to 'rule out' [a more favorable outcome]
to prevail. Rather, Strickland places the burden on the defendant,
not the State, to show a 'reasonable probability' that the result

---

[1] "[A] court need not determine whether counsel's performance was
deficient before examining the prejudice suffered by the defendant." Strickland,
466 U.S. at 697, 104 S. Ct. at 2069. If a reviewing court finds a lack of
prejudice, it need not determine whether, in fact, counsel's performance was
deficient. Id.

would have been different."), *reh'g denied*, 558 U.S. 1138, 130 S. Ct. 1122, 175 L. Ed. 2d 931 (Jan. 11, 2010).  Where, as here, a movant contends that her attorney rendered ineffective assistance at a sentencing hearing, prejudice is established where a misapplication of the Sentencing Guidelines increased a prisoner's sentence.  <u>Glover v. United States</u>, 531 U.S. 198, 202-04, 121 S. Ct. 696, 700-01, 148 L. Ed. 2d 604 (2001).

"Surmounting <u>Strickland</u>'s high bar is never an easy task." <u>Padilla v. Kentucky</u>, 559 U.S. 356, 371, 130 S. Ct. 1473, 1385, 176 L. Ed. 2d 284 (2010).

> An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. <u>Strickland</u>, 466 U.S., at 689-690, 104 S. Ct. 2052.  Even under *de novo* review, the standard for judging counsel's representation is a most deferential one.  Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge.  It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence."  <u>Id.</u>, at 689, 104 S. Ct. 2052; *see also* <u>Bell v. Cone</u>, 535 U.S. 685, 702, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002); <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 372, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993).  The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom.  <u>Strickland</u>, 466 U.S., at 690, 104 S. Ct. 2052.

<u>Richter</u>, ___U.S. ___, 131 S. Ct. at 788.

Issue 1A, Issue 1B, and Issue 2

Defendant contends that the United States' failure to file a motion for a downward departure pursuant to U.S.S.G. § 5K1.1 violated her right to due process. (D.E. 1 at 6.) She also alleges that counsel's not objecting to the Government's failure to file the motion and not raising that omission on appeal constituted ineffective assistance. (Id.) The terms of Defendant's plea agreement have been set forth herein. The United States agreed to recommend that Defendant receive a three level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1 and that she be sentenced at the lowest end of the applicable guideline range. (Cr. D.E. 248, ¶ 5.) The agreement contained no promise that the United States would recommend a downward departure. By signing the agreement, Martinez expressly acknowledged that "there are no other agreements between and among the parties to this agreement. (Cr. D.E. 248, ¶ 8.)

Defendant confirmed in open court, under oath, that she understood the consequences of her guilty plea, including the waiver of her right to appeal and that she was satisfied with her attorney's advice and representation. (Cr. D.E. 485 at 3-5, 14.) Defendant testified that she had read and understood the plea agreement. (D.E. 485 at 12.) During the hearing the Court asked the Assistant United States Attorney if there was a possibility of a 5K1 motion. (D.E. 485 at 14.) The Assistant United States Attorney replied, "No, sir." (Id.) Martinez stated that no one had

made a promise or prediction about what her sentence would be. (D.E. 485 at 15.)

By pleading guilty, and after receiving the full three-point reduction for acceptance of responsibility, Defendant's total offense level was reduced from thirty-four to thirty-one. (D.E. 486 at 9.)

There is no right to a downward departure. A district court may, on motion of the government, reduce a sentence to reflect a defendant's substantial assistance in the investigation or prosecution of another. 18 U.S.C. § 3553(e); Fed. R. Crim. P. 35(b); U.S.S.G. § 5K1.1. Whether the government moves for a sentence reduction based on substantial assistance is a matter of discretion, subject only to constitutional limitations, and the district court has no authority to lower a sentence based on the defendant's assistance absent a motion by the government. Wade v. United States, 504 U.S. 181, 185-86, 112 S. Ct. 1840, 1843-44, 118 L. Ed 2d 524 (1992); Sullivan v. United States, 11 F.3d 573, 575 (6th Cir. 1993). In many plea agreements, the government refers to the possibility of a § 5K1.1 motion but ultimately reserves discretion to determine whether the motion is appropriate. See United States v. Watson, 988 F.2d 544, 552 n. 3 (5th Cir. 1993).

Martinez claims that she agreed to cooperate, spoke with agents on two or three occasions, and gave extensive debriefings. (D.E. 1 at 6.) Defendant's plea agreement, however, does not include the promise or even the possibility of a § 5K1.1 motion. Thus, the United States retained sole discretion to file such a motion. Where

the United States retains that discretion, it's decision may be reviewed "only for unconstitutional motives." United States v. Moore, 225 F.3d 637, 641 (6th Cir. 2000). Martinez does not infer any unconstitutional motive here.

Defense counsel has provided an affidavit stating that "Defendant did not want any reference to Section 5K1" because "she feared retribution in the form of harm to her children." (D.E. 7 at 1, ¶ 1.) Counsel further states that "the Government did make concessions in the Plea Agreement in lieu of Section 5K1 consideration." (Id.) Although Martinez contends that counsel should have raised this issue on appeal, she fails to mention that she requested her attorney to file an appeal. Counsel states that "there was never any request from the Defendant to file any appeal based on the Government's failure to file a motion pursuant to Section 5K1." (Id.) The record demonstrates that Defendant knowingly and voluntarily waived her right to appeal.

Under these circumstances, there was no viable basis for compelling the government to move for a reduced sentence. The failure to make this showing independently defeats Martinez' claims that counsel should have objected to the United States' failure to request a downward departure at sentencing or that counsel had a basis for raising the issue on appeal. Martinez has not shown that she was actually prejudiced by counsel's failure to raise a futile objection at sentencing or frivolous issue on appeal. Furthermore, she received a sentence below the applicable guidelines range and cannot establish that the Court would have departed further.

Martinez has failed to demonstrate that her attorney's performance was deficient in a constitutional sense. Issue 1A, Issue 1B, and Issue 2 are DENIED.

## Issue 1C and Issue 1D

Defendant insists that her attorney performed deficiently when he did not object to the drug amounts attributed to her at sentencing. (D.E. 1 at 6.) She objects to the inclusion of four pounds of methamphetamine brought from Mexico by Anthony Martinez. (Id.) The inmate also objects to counsel's failure to challenge the enhancement of her sentence for her role in the offense. (D.E. 9.)

On September 22, 2009, counsel filed written objections to the PSR. (Cr. D.E. 364.) Objection One and Two stated:

> The Defendant objects to the four level increase at page 23 paragraph 5B pursuant to §3B1.1(a) in that she denies being an organizer of leader of a criminal activity that involved five or more participants. She also denies that the activity was otherwise extensive. A four level increase should not have been added.

> The Defendant, Janet Martinez, had a lesser role than some of the co-defendants indicted with her. It is her belief that none of the other co-defendants received this four-level increase even though their roles were, in fact, equal to or greater than hers. The contested portion of the Presentence Report as set forth below not only support [sic] the exclusion of the quantities as mentioned therein but also support the proposition that a four level increase should not have been given for Ms. Martinez as an organizer or leader of the criminal activity.

> The Defendant objects that four pounds of methamphetamine brought in from Mexico by Anthony Martinez as alluded to on page 22, paragraph 52 of the report is attributed to her. This amount should not have been attributed to her.

> Ms. Martinez specifically objects to that part of paragraph 45 which states as follows:

> "Ms Parrish stated that Anthony Martinez had bragged to her about making several trips to Mexico to pick up drugs, for which he was paid $5,000 per trip. Anthony Martinez told her that he would typically bring back a couple (2) pounds of ice in washing powder boxes."

> Ms. Martinez states that she does not believe that this statement by Ms. Parrish is truthful. Should it be truthful, Ms. Martinez denies that any of this should be attributable to her in that she has no knowledge as to this activity. The four pounds of methamphetamine as mentioned in paragraph 52 in the indentions should be deleted from the calculation as to quantity attributable to Ms. Martinez as a leader.

(Cr. D.E. 364 at 2-3.)

The probation officer responded to the objections, stating:

> The defendant was assigned a four-level increase for being a leader or organizer in the Count one conspiracy based on corroborating voluntary statements by numerous co-conspirators. The assignment of a leadership role was also based on the circumstances of, and information gained during, multiple undercover drug buys. More specifically, the defendant's leadership role was determined based on statements given to case agents by indicted co-defendants Paul Bingham (paragraphs 21, 28, and 30), Santiago Martinez-Amezquita (paragraphs 41-43), Adolfo Ortiz-Alcazar (paragraph 46), and Henry Allen (paragraphs 13 and 14). The defendant's leadership was also indicated in statements given to case agents by co-conspirators Carrie Parrish (paragraphs 40 and 45), Shawn Riley (paragraphs 24, 25, and 37), Derek Patterson (paragraph 35), and Marcelo Vera (paragraph 39). Based on all available information regarding this matter, it is the probation officer's conclusion that Janet Martinez was the primary leader and organizer of the drug conspiracy charged in Count one of the indictment.

> The four (4) pounds of meth referenced in this objection was assigned to Ms. Martinez based on the July 30, 2008, voluntary statement of Carrie Parrish (paragraph 45 of the presentence report) that Anthony Martinez had bragged to her about making several trips to Mexico to pick up drugs, for which he was paid $5,000 per trip. Anthony Martinez told her that he would typically bring back a couple (2) pounds of ice in washing powder boxes. Due to Ms. Martinez' role as the primary leader and organizer of the Count one drug conspiracy, all drug quantities received

and/or distributed within the scope of that conspiracy would be reasonably foreseeable to her. Therefore, those quantities would [be] attributable to her as relevant conduct. It is the probation office's position that the voluntary statement of Carrie Parrish is credible and corroborative. Therefore, at least four (4) pounds of meth may be attributed to the defendant based on the content of that statement.

(Addendum to PSR, October 2, 2009.)

During the sentencing hearing, the following exchanges took

place:

The Court:      All right, sir, I'll hear from you, Mr. West. You had several matters you had addressed.

Counsel:        Your Honor, we have continued the sentencing in this case a couple of times, and through that process we've been able to save, hopefully, the court some time in looking at some of this. After further review, my client acknowledges that 36 is the proper level with regard to the quantity that would be involved. That was one of the issues that we raised, and so we won't have to - we will not have to hear that issue, Your Honor. And the other being whether or not she is in a leadership role. Certainly she would want to submit to Your Honor that she never felt like that she was really controlling a lot of things in this endeavor; but, having reviewed the statutory language and the statutory definition of that concept, she understands that that point probably needs conceding as well. I would point out to Your Honor that her criminal history would qualify her for the safety net, and were it not for the leadership role, she would - she would fall into that category. And I would ask Your Honor here today to consider a couple of things. Number one, the opportunities that Ms. Martinez has had to participate in programs while at Mason. It's fairly limited to what they offer, but everything they've offered she's tried to - tried to get involved in and tried to participate. And I do believe that Ms. Martinez is sincere when she tells me, and I believe she'll tell the court, that she deeply regrets her involvement in this endeavor. Also I would point out to Your Honor - and I believe Your Honor does have some flexibility under 3553 - I believe it's subsection (e) - to consider the fact that she does have five children, the youngest being four years of

38

age up to the age of fourteen years. Other than - other than this one - and she picked a good one to start with, I guess, but she only has one criminal history point throughout this whole situation. So I would ask Your Honor to -

The Court: I don't think she has any criminal history points, does she?

Counsel: I'm sorry?

The Court: She doesn't have any criminal history points.

Counsel: Zero; yes. She's category I.

The Court: Category I.

Counsel: Correct. I misspoke. She has no criminal history points, Your Honor, which, again, it's that leadership thing that knocks her out of any kind of safety valve consideration. But I would ask Your Honor to consider her family situation with the five children and give some type of downward departure due to that circumstance.

The Court: All right, I just want to make sure that I haven't missed anything. So as far as the organizer, that's not - that's an issue, but you're not going to argue that. Is that correct?

Counsel: No, Your Honor. I have talked with Ms. Martinez and we've had further discussions, and she understands the concept and she understands the legal definition, though she did not feel like herself that she was really that much in charge of anything. But that's not necessarily the legal standard.

The Court: Yes, sir. What about the inclusion of four pounds of meth brought in from Mexico by Anthony Martinez attributable to her: I think there was an objection to the -

Counsel: Your Honor, the situation we have in our position paper objections, there were some facts that were taken from some other defendants who evidently gave proffers, and those statements were not quite accurate in terms of her involvement and the weight that was attributed to her. However, through our discussions, it's been determined that the quantity amount, which I believe is five but not less than fifteen - it's been determined that that is a correct

> range. The exact facts in the presentence report may
> not be exactly accurate, but we are conceding the
> point that the government could produce proof that
> would get her into that range. So we're not
> contesting that.

(Cr. D.E. 486 at 3-6 .)

Defendant waived her objections to the PSR. Martinez does not
address counsel's statement that the government could produce proof
that would reach the amount attributed to her in the PSR and in
calculating her offense level whether or not Anthony Martinez' four
pounds were included. The affidavit provided by counsel states that
"[t]he quantity to which the Defendant was sentenced was negotiated
and was agreed to by the Defendant prior to final sentencing."
(D.E. 7 at 1, ¶ 2.) Martinez presents no evidence that provides a
legitimate basis for an objection to the drug quantity. Counsel is
not ineffective by failing to raise frivolous objections.

Defendant submits no factual basis for a challenge to the
leadership enhancement. The probation officer concluded that she
was the primary leader and organizer of the drug conspiracy based on
the statements of four of her eight co-defendants. (PSR Addendum,
October 10, 2009.) The organization also included four co-
conspirators who gave statements. (Id.) Martinez' motion provides
no basis for concluding that she was not, in fact, an organizer or
leader or that the criminal activities at issue did not involve five
or more persons. The presentence report contains sixteen pages
detailing Martinez' offense conduct. Her conclusory allegations are
insufficient to satisfy her burden of making a plausible showing of
prejudice from any failure to object to the enhancement.

Martinez did not raise these issues on direct appeal and does not allege that she requested that counsel raise them on appeal. Mistakes in the application of the sentencing guidelines are non-constitutional errors. *See* <u>Grant</u>, 72 F.3d at 506. Non-constitutional errors ordinarily are not cognizable on collateral review. <u>Id.</u> For Martinez to prevail on these issues, the errors must be "'fundamental defect[s] which inherently result[] in a complete miscarriage of justice,' or, [] error[s] so egregious that [they] amount[] to a violation of due process." <u>Watson v. United States</u>, 165 F.3d 486, 488 (6th Cir. 1999) (quoting <u>United States v. Ferguson</u>, 918 F.2d 627, 630 (6th Cir. 1990) (citing <u>Hill v. United States</u>, 368 U.S. 424, 428, 82 S. Ct. 468, 471, 7 L. Ed. 2d 417 (1962)).

Defendant voiced no objections to the guideline calculations during the sentencing hearing. The range was calculated at 210 to 262 months. The Court recognized that the guidelines were advisory and fashioned a below guidelines sentence pursuant to the factors found in 18 U.S.C. § 3553, sentencing Martinez to 180 months. No objections were made after the sentence was imposed. As she cannot demonstrate a fundamental defect or egregious error, Issues 1C and 1D are DENIED.

Issue 3

Defendant contends that she is entitled to a sentence reduction based on the United States Supreme Court's decision in <u>Alleyne v. United States</u>. In <u>Alleyne</u>, ___ U.S. at ___, 133 S. Ct. at 2155 (overruling <u>Harris v. United States</u>, 536 U.S. 545, 122 S. Ct. 2406,

41

153 L. Ed. 2d 524 (2002)), the Supreme Court held that any fact that increases the mandatory minimum sentence for a crime is an element of the crime that must be submitted to a jury.

Although Alleyne did announce a new rule of law, Simpson v. United States, 721 F.3d 875, 876 (7th Cir. 2013), it is not retroactively applicable to cases on collateral review. Generally, if the Supreme Court announces a new rule of law, the rule applies to all cases still pending on direct review, but not to convictions that are already final except "in limited circumstances." Schriro v. Summerlin, 542 U.S. 348, 351-52, 124 S. Ct. 2519, 159 L. Ed. 2d 442 (2004). Those circumstances include the announcement of: (1) new rules of substantive law, such as those that "that place particular conduct or persons covered by the statute beyond the State's power to punish," and (2) new "watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." Id. at 352 (citations and internal quotation marks omitted).

Alleyne does not fit within either exception, first because it announces a procedural rather than a substantive rule. See Alleyne, ___ U.S. at ___, 133 S.Ct. at 2164 (Sotomayor, J., concurring) (explaining that the Court's decision was consistent with principles of stare decisis in part because Alleyne was a case where "procedural rules are at issue that do not govern primary conduct"); id. at 2173 n.* (Alito, J., dissenting) (agreeing that Alleyne involves a procedural rule that does not govern primary conduct).

Second, Alleyne does not announce a "watershed" rule of criminal procedure. The Supreme Court has noted that "[t]his class of rules is extremely narrow, and it is unlikely that any has yet to emerge." Schriro, 542 U.S. at 352 (internal quotation marks and alterations omitted). Even assuming such cases exist, every court to consider the issue has concluded that Alleyne does not qualify, as it provided only a limited modification to the Sixth Amendment rule announced in Apprendi. As the Seventh Circuit recently explained, Apprendi itself and the subsequent rulings applying and extending Apprendi have not been applied retroactively: "*Alleyne* is an extension of Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). The Justices have decided that other rules based on *Apprendi* do not apply retroactively on collateral review. This implies that the Court will not declare Alleyne to be retroactive." Simpson, 721 F.3d at 876 (citations omitted). Regardless, the decision whether to make Alleyne retroactive rests solely with the Supreme Court, and it has not chosen to do so. *Cf*. Simpson, 721 F.3d at 876 ("Unless the Justices themselves decide that *Alleyne* applies retroactively on collateral review," lower courts may not do so.). Alleyne does not provide Martinez with any basis for relief because the Supreme Court has not chosen to make apply retroactively to cases on collateral review.

Moreover, Alleyne is inapplicable to the instant case because Martinez admitted to the facts used to calculate the drug quantity. *See* United States v. Yancy, 725 F.3d 596, 599 (6th Cir. 2013) ("Because *Alleyne* did not involve the effect of a defendant's

admission of the facts necessary for an aggravated crime, it leaves undisturbed our cases deeming such admissions fatal to *Apprendi* claims. These cases recognize that, when a defendant knowingly admits the facts necessary for a sentence enhancement in the context of a plea, simultaneously waiving his Sixth Amendment right to a jury trial, no *Apprendi* problem arises.") (internal citations omitted)). Moreover, the leadership enhancement in the PSR did not affect the statutory sentencing range. *See* <u>United States v. Wesley</u>, 534 F. App'x 211, 212 n.* (4th Cir. 2013) (per curiam). Issue 3 is DENIED.

The motion, together with the files and record in this case "conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255. Defendant's conviction and sentence are valid and, therefore, her motion to vacate is DENIED. Judgment shall be entered for the United States.

Twenty-eight U.S.C. § 2253(a) requires the district court to evaluate the appealability of its decision denying a § 2255 motion and to issue a certificate of appealability ("COA") "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also* Fed. R. App. P. 22(b). No § 2255 movant may appeal without this certificate.

A COA may issue only if the movant has made a substantial showing of the denial of a constitutional right, and the COA must indicate the specific issue(s) that satisfy the required showing. 28 U.S.C. §§ 2253(c)(2) & (3). A "substantial showing" is made when

the movant demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 336, 123 S. Ct. 1029, 1039, 154 L. Ed. 2d 931 (2003) (internal quotation marks & citation omitted); *see also* Henley v. Bell, 308 F. App'x 989, 990 (6th Cir. 2009) (per curiam) (same), *cert. denied*, 555 U.S. 1160, 129 S. Ct 1057, 173 L. Ed. 2d 482 (2009). A COA does not require a showing that the appeal will succeed, Miller-El, 537 U.S. at 337, 123 S. Ct. at 1039; Caldwell v. Lewis, 414 F. App'x 809, 814-15 (6th Cir. 2011), however, courts should not issue a COA as a matter of course. Bradley v. Birkett, 156 F. App'x 771, 773 (6th Cir. 2005), *reh'g en banc denied* (Jan. 10, 2006).

In this case, for the reasons previously stated, the issues raised by Defendant lack substantive merit and, therefore, she cannot present a question of some substance about which reasonable jurists could differ. The Court therefore DENIES a certificate of appealability.

The Sixth Circuit has held that the Prison Litigation Reform Act of 1995, 28 U.S.C. § 1915(a)-(b), does not apply to appeals of orders denying § 2255 motions. Kincade v. Sparkman, 117 F.3d 949, 951 (6th Cir. 1997). Rather, to appeal *in forma pauperis* in a § 2255 case, and thereby avoid the appellate filing fee required by 28 U.S.C. §§ 1913 and 1917, the prisoner must obtain pauper status pursuant to Fed. R. App. P. 24(a). Kincade, 117 F.3d at 952. Rule

24(a) provides that a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit. Fed. R. App. P. 24(a)(1). However, Rule 24(a) also provides that if the district court certifies that an appeal would not be taken in good faith, or otherwise denies leave to appeal *in forma pauperis*, the prisoner must file her motion to proceed *in forma pauperis* in the appellate court. *See* Fed. R. App. P. 24(a)(4)-(5).

In this case, for the same reasons it denies a certificate of appealability, the Court determines that any appeal would not be taken in good faith. It is therefore CERTIFIED, pursuant to Fed. R. App. P. 24(a), that any appeal in this matter would not be taken in good faith, and leave to appeal *in forma pauperis* is DENIED. If Defendant files a notice of appeal, she must also pay the full $505 appellate filing fee or file a motion to proceed *in forma pauperis* and supporting affidavit in the Sixth Circuit Court of Appeals within thirty (30) days.

IT IS SO ORDERED this 31st day of March 2014.

s/ J. DANIEL BREEN

J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE